U.S. Department of Justice

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2010 OCT -1  P 2: 21

CLERK'S OFFICE
AT BALTIMORE

BY_____ MW

United States Attorney
District of Maryland
Northern Division

| | | |
|---|---|---|
| Rod J. Rosenstein<br>United States Attorney<br><br>Joyce K. McDonald<br>Chief, Fraud and Corruption | 36 South Charles Street<br>Fourth Floor<br>Baltimore, Maryland 21201 | DIRECT: 410-209-4899<br>MAIN: 410-209-4800<br>FAX: 410-962-3091<br>TTY/TDD: 410-962-4462<br>Joyce.McDonald@usdoj.gov |

September 28, 2010

Joseph Evans
Assistant Federal Public Defender
100 South Charles Street
Tower II, Ninth Floor
Baltimore, Maryland 21201

> Re:   United States v. James William Fox, II
> Criminal No. JFM-09-0639

Dear Mr. Evans:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by **October 1, 2010**, it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

1.    The Defendant agrees to plead guilty to Count 1 of the Indictment now pending against him, which charges him with conspiracy to commit wire fraud, in violation of 18 U.S.C. 1349. The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

### Elements of the Offense

2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

(1) That two or more persons entered the unlawful agreement charged in the Indictment;

(2)  That the defendant knowingly and willfully became a member of the

Revised 11/5/09

conspiracy;

(3) That one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the indictment; and

(4) That the overt act  was committed to further some objective of the conspiracy.

## Penalties

3.       The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: twenty (20) years imprisonment, a fine of $250,000, and a term of supervised release of not more than three (3) years.  In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing.  This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1]  If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise.  The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release.  The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.       The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.       If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel.  That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.       If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community.  Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily.  All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count.  The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.       If the Defendant went to trial, the government would have the burden

---

[1]       Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

        d.      The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

        e.      If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

        f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

        g.      If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

        h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status.

<u>Advisory Sentencing Guidelines Apply</u>

        5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

<u>Factual and Advisory Guidelines Stipulation</u>

        6.      This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

The base offense level is 7. U.S.S.G. 2X1.1(a) & 2B1.1(b)(1).

This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct.

This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty, provided that the Court finds that the offense level is 16 or greater as described below.

This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

7.     The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8.     This Office and the Defendant agree that the following facts and/or sentencing guidelines factors are in dispute:

a.     In the view of this Office, sixteen (16) levels are added because the foreseeable loss is more than $1 million but less than $2.5 million. 2B1.1(b)(1)(h). The defendant contends that it is a lower number.

b.     In the view of this Office, two (2) levels are added because the victims were unusually vulnerable as they were not real estate professionals and were in foreclosure or serious financial trouble. 3A1.1(b)(1).

9.     This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

<u>Obligations of the United States Attorney's Office</u>

10.     At the time of sentencing, this Office will recommend a guideline sentence, no criminal fine, and restitution. At the time of sentencing, this Office will move to dismiss any open

4

counts against the Defendant.

11.     The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including the conduct that is the subject of the counts of the Indictment that this Office has agreed to dismiss at sentencing.

## Forfeiture

12.     The defendant understands that the court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order of forfeiture may include assets directly traceable to his offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.  Specifically, the court will order the forfeiture of proceeds obtained as a result of the offense and any property involved in the offense. The defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

## Assisting the Government with Regard to the Forfeiture

13.     The defendant agrees to assist fully in the forfeiture of the foregoing assets. The defendant agrees to disclose all of his assets and sources of income to the United States, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture.  The defendant further agrees that he will not assist any third party in asserting a claim to the forfeited assets in an ancillary proceeding and that he will testify truthfully in any such proceeding.

## Waiver of Further Review of Forfeiture

14.     The defendant further agrees to waive all constitutional, legal and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The defendant also agrees not to challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this agreement, and will not assist any third party with regard to such challenge or review or with regard to the filing of a petition for remission of forfeiture.

## Waiver of Appeal

15.     In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a)      The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

b)      The Defendant and this Office retain their right to appeal issues relating to the establishment of the advisory sentencing guideline range, the weighing of sentencing factors, the decision whether to impose imprisonment, and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c)      Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d)      The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

16.     The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

17.    The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

18.    This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _Joyce K. McDonald_
Joyce K. McDonald
Assistant United States Attorney

7

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

_10/1/10_
Date                              _____
                                  James William Fox, II

I am Mr. Fox's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

_10/1/10_
Date                              _____
                                  Joseph Evans, Esq.

## STATEMENT OF FACTS

James Fox and James Dan met in Annapolis when both were loan officers for a mortgage broker, First Fidelity.  Beginning in 2006, James Fox began to identify prospective borrowers who owned their homes and had equity in their homes, but who could not afford their mortgage payments and were at risk of losing their homes because they were either in foreclosure, bankruptcy, or financial distress.  Fox, and sometimes Fox and Dan, told potential victims that they could save their houses.  The promises as expressed to the victim involved transferring the home to either James Dan or James Fox, who could obtain a new mortgage loan.   Dan or Fox promised to make the payments on the new mortgage loan for six  months in some instances and in others, for a year.  The individual would "repair" their credit and then re-finance the property and re-acquire it.  During this six month or one-year period, the individual was going to live in the house.

In order to obtain the mortgage loans in his name, Fox  made materially false and fraudulent loan applications including falsification of his intent to occupy the property, annual income, savings, other properties owned, and source of the borrower's funds for closing. Dan did as well.   Fox was typically the loan officer for Dan's loans and was aware of Dan's material misrepresentations.

Fox and Dan attended settlements on these properties which were required to be conducted according to the financial terms and conditions specified by the mortgage lenders and set forth on the settlement statements (sometimes called HUD-1s).  These HUD-1s were false. The source of funds for the closing and the disposition of the sales proceeds materially varied from the HUD-1 which was furnished to the lender as set forth in more detail below.  Fox was

1

motivated to enter these transactions because he received a portion of the seller's proceeds which were set forth on Line 603 of the HUD-1, even though Fox (or Dan) was the buyer.

**O.G., Waldorf, MD to James Fox: April 20, 2006**

In 2006, Ms. O.G. had a $166,000 mortgage on the property, and she was in bankruptcy proceedings. Her bankruptcy attorney referred her to First Fidelity Mortgage for a possible re-finance. After talking to a loan officer there, she was referred to James Fox. On April 20, 2006, Fox purchased 12012 Calico Woods from Ms. G. for $315,000–approximately $148,000 higher than Ms. G.'s first mortgage loan, on which she was behind. Fox obtained a $267,750 loan on the property. On his mortgage loan application, Mr. Fox stated that he had $35,175 in an account at Morgan Stanley, and $8,464, at Legg Mason. Both statements were false. At settlement and to obtain the loan, Fox signed an "Occupancy Affidavit" stating that he would live in the Calico Woods house. He had no intention of living there.

According to the HUD-1, Mr. Fox brought $47,646.30 of his funds to the settlement table as borrower's funds to close and Ms. G as the seller received $108,729.10 after pay-off of her first mortgage and nearly $23,000 to her bankruptcy trustee. However, contrary to the HUD-1, the title company permitted Fox to use $42,791.85 of Ms. G's sale proceeds as the balance of the borrower's money to close. The title company withheld $4,854.45 from Ms. G's seller's funds to make up the entire $47,646.30. At Fox's request, the title company instructed its bank to use Ms. G's seller's proceeds to purchase a cashier's check for $52,082.80 payable to James Fox, which Mr. Fox deposited to the account of Charm City Investment Group, LLC, which was his company. From the $108,729.10 listed on the HUD-1 as seller's proceeds, Ms. G received only a $10,000 check.

2

For about six months, Fox made the mortgage payments which totaled approximately
$9,000. After that he provided to Ms. G. funds of $1300 - $1500 each month for her to purchase
a cashiers check which Fox mailed to the lender. Fox later defaulted on the mortgage. Ms. G.
was unable to buy it back. She remains in her house, but she is no longer in title on her home.

**K.P., Glen Rock, PA to Fox: June 14, 2006**

K. P. once owned and lived at 12 Junior Street, Glen Rock, PA. He mortgaged the
property for $67,000 to have funds so that he could loan money to his son and could take care of
his mother who had cancer. His lender, Countrywide, started foreclosure proceedings when he
got behind on the payments. In Glen Burnie, Maryland, K.P. saw a sign posted on a telephone
pole that advertised help if you were in foreclosure. He called the number and got James Fox.
Fox told him that First Fidelity couldn't help him, but that he (Fox) had other options. Fox drove
to Glen Rock to meet K.P. and proposed assisting K.P. by restoring K.P.'s credit and saving his
home from foreclosure. Fox said that K.P. would have to sign over the house to Fox for a year.
K.P. understood this to mean that Fox would co-own the house with K.P.  Fox referred to this
arrangement as a lease with option to buy back. K.P. believed that funds disbursed from this new
mortgage would pay off his mother's medical bills, his delinquent utility bills, and other debt.

On his mortgage loan application, Mr. Fox provided a false home address; he used the
Calico Woods address where Ms. G. was living. He falsely reported the same Morgan Stanley
and Legg Mason accounts.

At the settlement held on June 14, 2006, K.P. as the seller should have received
$42,813.98, according to the HUD-1.   K.P. received nothing, but his tax liens on the property of
approximately $2900 were paid.    $20,039.81 from K.P.'s seller's proceeds funded Fox's

3

buyer's funds to close; the rest of the seller's proceeds were two $10,000 checks. The checks were made payable to K.P., but he endorsed them over to Fox, who deposited both into his Charm City Investment Group, LLC account at Bank of America.[1] For a year, K.P. met Fox in Baltimore, and Fox withdrew funds to make the mortgage payments. After a year, Fox sent K.P. a mortgage loan application which falsely showed his monthly income as $2400; in fact, he received $1176 monthly in disability payments. K.P. did not sign and did not send in the mortgage loan application. Fox defaulted on the mortgage loan. K.P. has moved out, and the property is no longer in his name.

### C.W., Capitol Heights, MD to James Dan: August 4, 2006

On or about August 4, 2006, James Fox and James Dan attended a settlement at Everclear Title for Dan to purchase a Capitol Heights, MD property from CW for $225,000. C.W. chose Everclear Title. Dan made a materially false loan application to obtain the mortgage loan. According to the HUD-1, CW as the seller was to have her first mortgage loan and certain of her debts (approximately $28,000) paid off and then to receive $63,893.79 in seller's proceeds. Everclear Title issued a check for $63,893.79 to C.W. Fox led CW to believe that in order to be "rescued," she had to turn over all the funds from settlement to him and Dan. C.W. signed over her seller's proceeds check to James Dan. The seller's proceeds were used to fund the buyer's (Dan's) funds for closing despite the fact that the settlement statement represented that Dan had supplied the buyer's funds to close from his own money. The remainder of the seller's proceeds were deposited into Dan's account, which he shared with Fox. $3,000 in cash was given to C.W. Fox also received a mortgage loan origination fee as the loan officer on the

---

[1]Mr. Fox contends that he returned $4,000 in cash from this amount to K.P.

4

loan.

On October 3, 2006, CW received from Everclear Title a check in the amount of $11,804.62, which refunded amounts her creditors had been overpaid. Fox persuaded CW to endorse this check over to him, and he deposited the check in his account at Bank of America ending in 4915. She believes that she received $3,000 from Mr. Fox; he believes that she received approximately $3890, and he split the rest with Mr. Dan. From September 2006 - April 2007, CW met James Fox at various locations, and he gave cash to CW to purchase money orders made payable to GMAC for mortgage payments on the house in Dan's name. In all, she received approximately $5,203.91 from Fox for payments. CW is no longer in title to her home.

### D.N., Hagerstown, MD to James Dan, POA James Fox: August 21, 2006

On or about August 21, 2006, James Fox, with a power of attorney from James Dan, attended a closing for Dan to purchase a Hagerstown, MD property from DN for $255,000. The HUD-1 showed that DN's first mortgage loan was being paid off as well as some tax liens. DN was to receive $67,504.07 in sales proceeds according to the HUD-1. Dan's mortgage loan application was materially false. Dan received $31,780.31 of DN's funds which he used to fund the buyer's funds for closing. Fox, on Dan's behalf, received a $30,723.75 check which was made payable to DN but endorsed over to Dan. Dan deposited the check into his M&T 5098 account. On August 24, 2006, Dan wrote a check to James Fox in the amount of $12,361.88. DN received $5,000 from the closing. Fox also received a commission as the loan officer for the mortgage. In 2006 - 2007, Dan demanded "rent" from DN, and DN paid him over $11,000 which Dan used to make Dan's mortgage payments. The house went into foreclosure.

5

**T.R. & A.R., Chesterfield, VA to Fox: November 14, 2006**

T.R. and A.R. lived in Chesterfield, VA, in the same house from 1997 - 2006. In 2006,

they received a mailing from First Fidelity mortgage advertising a variety of mortgage loan plans.

At the time, T.R. and A.R. were behind on their house payments but not in default. They called

First Fidelity and spoke with a mortgage broker who told them they didn't qualify for a re-

finance because of their poor credit, but that James Fox might be able to help them.   In telephone

conversations with T.R. and A.R., Mr. Fox agreed to use his credit to refinance the house; the

family understood that the house and mortgage would continue to be in their names.  Fox was to

receive $15,000 for this service; he would receive funds from the "re-finance" which he would

escrow to cover six months of mortgage payments on the house.  After six months, Fox was to

remove his name from the deed and mortgage, and both would solely be in the family's name

again.  At closing, the family was to receive $20,000 to cover outstanding bills.

T.R. and A.R. met Fox in person for the first time when they attended the closing in

Annapolis, MD on November 14, 2006.  According to the HUD-1, Fox purchased the house for

$265,000 and brought $19,862.50 to the settlement table to close.  According to the HUD-1, the

sellers' old mortgage of $172,165.74 was paid off, and the sellers received $75,078.22 in

proceeds from the sale. In fact, $19,862.50 of the proceeds was used for Fox' funds for closing.

The sellers received a $55,078.22 check at settlement which Fox told them they had to sign over

to him. Fox deposited this check in his Charm City Bank of America bank account.  Ten days

later, Fox sent the sellers a check for $22,000.  Fox kept approximately $33,000 for himself.  Fox

covered mortgage payments for six months and then told the sellers that they had to supply the

money for the mortgage payments.  Mortgage payments for six months were approximately

$9,786 ($1,631 x 6).

Fox' mortgage loan application was false in the following respects: he falsely listed his monthly income as $12,500, and he listed $13,000 in the Legg Mason account[2]. He disclosed the Waldorf, MD property, but he failed to disclose his ownership of the Pennsylvania property. He claimed that he was receiving rental payments on the Waldorf, MD property.

After six months, the family began providing $1631 each month to Fox to cover the mortgage payments. T.R. and A.R. still reside in this house, which is now the subject of litigation in Virginia.

**K.W. Baltimore, MD to Ed Krahling (Fox' stepfather): January 5, 2007**

On January 5, 2007, Ed Krahling, Fox' stepfather, purchased a Baltimore, MD house from K.W. at the behest of James Fox for $209,000.   K.W. had grown up in the house but his mother's medical problems caused him to mortgage the property ($67,000), and he got behind on the payments. K.W. saw Mr. Fox' advertisement on a place mat at the Double T diner. Fox produced the borrower's money to close for Ed Krahling and received the seller's proceeds of $78,090. Fox was the loan officer for Mr. Krahling's loan and also received a commission on the mortgage.   Fox knew that the letter of explanation furnished by Mr. Krahling to the lender which described how the purchase of 2607 Talbot Road had come about (8-00116) was false and knew that monies were loaned to Krahling and deposited into his bank account just long enough to produce a "verification of deposit" and were then returned. Some of KW's debts (approximately $8,000 of back city taxes and water charges and $38,000 of Maryland state taxes and other judgment liens) were paid out of settlement, and Fox paid approximately $7,000 in

---

[2]Fox' fiancée had an account at Legg Mason, but she was not a co-applicant on the loan.

repairs on the property which were not enough to make the property habitable.  Krahling

defaulted on the mortgage payments after eleven months.  Walker is no longer living in the

property.

**R.G., Pasadena, MD to James Dan: April 5, 2007**

On or about April 5, 2007, James Fox and James Dan attended a settlement for Dan  to

purchase a Pasadena, MD property from RG, a city firefighter.  Dan's loan application was

materially false.  According to the settlement statement, RG should have received $149,901.56

in sales proceeds.  Instead, RG received $31,000.  Approximately $118,901 was deposited into

Fox's Charm City bank account at Bank of America.  Fox used approximately $37,000 to re-pay

loans for funds James Fox had borrowed to use as the borrower's (Dan's) funds for the closing.

(The HUD-1 stated that the borrower had produced the funds for closing, but Fox actually

produced the funds for Dan.)  Fox wired $43,000 from the Charm City bank account to M&T

Bank for credit to the Five Star Financial account, an account on which Fox and Dan were

signatories.  On April 13, 2007, $42,000 was moved from the Five Star Financial account into

Dan's personal account.  Fox kept the balance, approximately $38,901,  for his own use.

**N.M., Silver Spring, MD to Fox: July 5, 2007**

On July 5, 2007, Fox purchased a Silver Spring, MD property from NM for $319,000.

The buyer's funds to close were provided by Fox and the seller according to the loan application.

In fact, a former First Fidelity broker borrowed the money from his mother, and Fox re-paid her

from the settlement proceeds plus an extra $1000.  In his loan application, Fox falsely stated that

his monthly employment income was $13,500, falsely stated that he had $70,078 on deposit at

8

Legg Mason[3] and falsely stated that he had $68,406 at RBC Dain Rauscher.

According to the HUD-1, after payment of the first mortgage lender and other debts of the seller's, the seller was to receive $135,840.62. The title company wired the funds to the bank account of the seller. That same day, N.M., Fox, and the First Fidelity broker went to N.M.'s bank. She purchased a cashier's check for $37,898.00 to pay a debt of her mother's and a check for $3,300 to pay a contractor and a $26,190.86 cashier's check to re-pay the broker's mother. Of the remaining funds, $43,451.76 was transferred to Fox's Charm City account at Bank of America, the broker received $15,000 in cash, and N.M. kept $10,000 for herself.

All eight properties purchased by Fox, Dan and Krahling are in default. None of the original owners is in title.

---

[3]As before, Fox' fiancé did have funds at Legg Mason but she was not a co-applicant on the loan.